IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | 1:16-CR-145-TWT-JKL-8 |
| ADRIAN JACKSON (8) | |

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This Order and Non-Final Report and Recommendation addresses the following pending motions filed by Defendant Adrian Jackson:

- Motion for Bill of Particulars [Doc. 735];

- Motion to Suppress, as to the fruits of a warrantless search of an automobile [Doc. 736];

- Motion to Suppress, as to statements made while Jackson was in custody [Doc. 750]; and

- Motion for Disclosure of Confidential Informants [Doc. 1037].

On May 19, 2017, the Court held an evidentiary hearing on Jackson's motions to suppress, and the hearing was continued on June 1, 2017. [Docs. 895, 900.] To refer to the hearing transcripts, the Court cites the docket number,

1

followed by the page of the PDF file.  The parties submitted post-hearing briefs on the motions to suppress.  [Docs. 994, 1036.]

The government has responded to Jackson's motion for bill of particulars. [Doc. 846.]  The government has also filed a response to Jackson's motion for disclosure of confidential informants.  [Doc. 1068.]

The Court addresses the pending motions in the following order:  (1) the motions to suppress, (2) the motion for a bill of particulars, and (3) the motion for disclosure of confidential informants.  For the following reasons, the Court **RECOMMENDS** that Jackson's motions to suppress be **DENIED**.  [Docs. 736, 750.]  The Court further **ORDERS** that Jackson's motion for a bill of particulars and motion for disclosure of confidential informants be **DENIED**.  [Docs. 735, 1037.]

## I.    BACKGROUND

Jackson is charged in this case with RICO conspiracy (Count One).  [Doc. 1.]  In connection with Count One, the indictment alleges that Jackson was a "Governor of Governors for the Western States," a position of regional authority within the Gangster Disciplines, and was also the National Treasurer of the gang. [*Id.* at 12.]  The indictment identifies specific overt acts that Jackson is alleged to have committed in furtherance of the RICO conspiracy:

2

On or about July 8, 2014, defendants SHAUNTAY CRAIG and ADRIAN JACKSON discussed supplying a new drug customer who would be buying multiple kilograms of cocaine every month.

On or about July 10, 2014, defendant ADRIAN JACKSON and Gangster Disciplines member C.H., aka "Six Face," who was then the Gangster Disciplines governor of South Carolina, discussed plans to expand the Gangster Disciplines into Salt Lake City, Washington D.C., Philadelphia, New Orleans, Wisconsin, and Kansas, and JACKSON reminded C.H. that defendant TERRANCE SUMMERS already had a "guy" in Salt Lake City.

On or about July 26, 2014, defendants SHAUNTAY CRAIG and ADRIAN JACKSON negotiated pricing for kilograms of cocaine.

[D]efendants SHAUNTAY CRAIG and ADRIAN JACKSON communicated regularly with incarcerated Gangster Disciplines Board Members.

[*Id.* at 28, 41.]

## II.   MOTIONS TO SUPPRESS [DOCS. 736, 750]

Jackson seeks to suppress evidence obtained and statements made on the day of his arrest in connection with the indictment in this case.  On May 19, 2017, the first day of the evidentiary hearing, Jackson's wife, Chaunda Jackson, testified.  [Doc. 895.]  At the continued hearing, on June 1, 2017, the following witnesses testified: FBI Special Agent Kimberly Vesling; FBI Special Agent Ryan Demmon, the lead agent for the arrest; Randy Swiney, an agent with the Fresno County Sheriff's Office and an FBI task force officer; and Erick Lauren,

3

an officer with the California Department of Corrections and an FBI task force officer.   [Doc. 900.]   The Court generally found the witnesses' testimonies credible, except where noted below.

The facts relevant to the motions to suppress are as follows.   Jackson was living with his wife, Chaunda Jackson, and his children in Lemoore, a city in Kings County, California.[1]   [Doc. 895 at 4-5; *see* Doc. 900 at 5, 31.]   Jackson and Chaunda Jackson shared a family car, a white Chevrolet Trailblazer, which was registered in Georgia in Chaunda Jackson's name.   [Doc. 895 at 5-6; Doc. 900 at 12.]   In connection with the present indictment, a warrant issued for Jackson's arrest, and the FBI coordinated with the Kings County Sheriff's Office to conduct a traffic stop and take Jackson into custody.   [Doc. 900 at 4-5.]   On May 4, 2016, at about 5:20 a.m., Jackson left his home, driving the Trailblazer.   [Doc. 895 at 7; Doc. 900 at 5.]   At 5:24 a.m., Jackson was pulled over.   [Doc. 900 at 32.]   At some point during the traffic stop, Jackson called his wife to tell her that he thought he was going to jail.   [Doc. 885 at 6-7.]   Jackson was arrested, searched, and placed in a police car.   [Doc. 900 at 32-33, 36, 53.]   During the traffic stop

---

[1]   The  government  repeatedly  suggests  that  Jackson  was  arrested  in Washington.  [*See* Doc. 994 at 2.]  Jackson was arrested in Lemoore, California, which is located in Kings County, near Fresno.  [Doc. 900 at 31-33.]

4

and arrest, officers did not ask Jackson for consent to search the car and did not search the car. [*Id.* at 7, 32, 43, 53.] Within about 10 to 20 minutes of the beginning of the traffic stop, police drove Jackson away from the scene toward the Kings County Sheriff's Office headquarters for an interview. [*Id.* at 32-33, 39-40, 53.] By 9:30 a.m., he was in the custody of the U.S. Marshals in the Eastern District of California, and at 10:45 a.m., he had an interview with a pretrial services officer. [*Id.* at 33-34.]

Meanwhile, after the police car carrying Jackson left the scene of the traffic stop, officers used a drug dog to conduct a "free air sniff" of the exterior of the Trailblazer. [Doc. 900 at 7-8.] The dog did not alert to the presence of narcotics. [*Id.* at 8.] At about 6:00 a.m., Special Agent Vesling and FBI Task Force Officer Nate Castro, who were participating in the coordinated take-down,[2] went to Jackson's home to ask Chaunda Jackson to consent to a search of the Trailblazer and to ask her whether she wanted the Trailblazer left on the side of the road or driven back to her home. [*Id.* at 8-9.] Both Special Agent Vesling and Officer Castro were in plain clothes but were wearing vests and visible handguns in

---

[2] Special Agent Vesling was responsible for surveillance as Jackson left his home, and she was not present at the beginning of the traffic stop. [Doc. 900 at 5-6.] She arrived at the scene of the traffic stop as Jackson was being handcuffed. [*Id.* at 7.]

holsters.  [Doc. 895 at 8-9; Doc. 900 at 9.]  They knocked on the door, and Chaunda Jackson answered.  [Doc. 900 at 9-10.]  While standing at the doorway, the agents told Chaunda Jackson that her husband had been arrested, asked for her consent to search the Trailblazer, and asked whether they could go inside the home to speak with her.  [Doc. 895 at 9-10, Doc. 900 at 10.]  Special Agent Vesling testified that Chaunda Jackson made a "verbal recognition" of the agents' request to come into the home and opened the door for them.  [Doc. 900 at 12-13.]

Chaunda Jackson testified that, when she was speaking with Special Agent Vesling and Officer Castro at the doorway, the agents explained that her husband had been arrested and told her about the charges he was facing.  [Doc. 895 at 10.]  She asked them to explain the charges further.  [*Id.*]  At some point, she asked whether she could go inside to check on her children to make certain that they were still asleep.  [*Id.* at 10-11.]  The agents told her that, if she went back inside, they would have to accompany her.  [*Id.* at 11.]  Chaunda Jackson responded, "[W]ell, if that's what you have to do, then that's what you have to do, but I have to check on my children."  She and the agents went inside the house.  [*Id.*]  Special Agent Vesling accompanied Chaunda Jackson down a hallway while she looked inside the children's bedroom.  [*Id.* at 11-12.]  Officer Castro stayed in the

living room, Chaunda Jackson believed, "to make sure that no one else was really there."  [*Id.* at 12.]  Special Agent Vesling referred to this procedure as a "safety sweep."  [Doc. 900 at 13.]  She testified that the agents checked two bedrooms, and a child was asleep in each room.[3]  [*Id.* at 13-14.]

Chaunda Jackson closed the front door and went into the kitchen, and Special Agent Vesling sat with Chaunda Jackson at the kitchen table.  [Doc. 895 at 14.]  Officer Castro stood off to the side and seemed "stern" with crossed arms.  Special Agent Vesling was "very relaxed" and asked Chaunda Jackson about her husband's finances, his associates, and whether he was involved in gang activity.  [*Id.* at 15-16.]  Officer Castro remarked in a "matter of fact" way that Chaunda Jackson was being "careful" with her word choice in answering those questions.  [*Id.* at 16.]  Chaunda Jackson testified that she was afraid during her encounter with the agents because she had "never been in any trouble with law enforcement" or "known [her] husband to be in any trouble."  [*Id.*]

---

[3] The Court does not draw any adverse credibility inferences from the slight differences in Special Agent Vesling's and Chaunda Jackson's testimony about the beginning of their encounter.  It appears that those two witnesses focused on different aspects of the encounter in recalling it.  Special Agent Vesling was focused on obtaining consent to search the car, and Chaunda Jackson was focused on the unwelcome surprise of finding law enforcement officers at her home.

Special Agent Vesling "lean[ed] forward" and asked Chaunda Jackson whether she consented to the search of the Trailblazer, and Chaunda Jackson felt that Special Agent Vesling was being direct or "real" with her. [Doc. 885 at 17.] Chaunda Jackson felt "pressured" to cooperate because of Special Agent Vesling's change in demeanor. [*Id.*] Chaunda Jackson agreed to the search. [*Id.* at 18.] She was anxious about whether the home could be searched or she could be "arrested for not cooperating," and she worried about what would happen to her children if she were arrested.[4] [*Id.*]

Special Agent Vesling did not have any consent forms with her, so she wrote out a consent agreement by hand. [Doc. 900 at 10-11.] Chaunda Jackson and Special Agent Vesling both signed the handwritten consent document, which stated: "May 4, 2016, Chaunda Jackson gave the FBI consent to search a white

---

[4] The Court finds that Chaunda Jackson credibly testified that she experienced anxiety and fear during her encounter with the agents, but the Court is not convinced that her anxiety and fear were as extreme as she suggested. Specifically, the Court does not find that Chaunda Jackson's fear and anxiety were so extreme that she believed she would be "arrested for not cooperating" if she refused to consent. This determination is based on the Court's observation of Chaunda Jackson at the hearing, her testimony about her encounter with the agents, and the record testimony as a whole.

8

Chevrolet Trailblazer, GA . . . License Plate PIY4372."[5]   [*Id.* at 12; *see also* Gov't Ex. 1.]   Chaunda Jackson also agreed to have the police drive the Trailblazer back to the house so that she did not have to go retrieve it.   [*Id.* at 14-15.]

After Special Agent Vesling informed police that they had Chaunda Jackson's consent to search the Trailblazer, they searched the interior of the car.   [Doc. 900 at 14, 46, 54.]   The drug dog sniffed the interior of the Trailblazer but

---

[5] Chaunda Jackson testified that she could "neither deny [n]or confirm" that her signature was on the handwritten consent form, and that the signature "d[id] not look like [her] signature."   [Doc. 895 at 27-28.]   The Court does not find those statements credible, in part based on the Court's observation of Chaunda Jackson's demeanor as she testified at the hearing, and in part because those statements are incongruous with the record testimony.   To the extent that Chaunda Jackson meant that she could not remember whether she signed the form, she testified about the rest of her encounter with Special Agent Vesling and Officer Castro in great detail.   The Court finds it incredible that Chaunda Jackson did not remember signing the form but remembered details such as Officer Castro's height, his hand position during the protective sweep, how far away Special Agent Vesling stood while they she checked on her children, and exactly what the agents said to her in the doorway.   [*See id.* at 9-13.]   To the extent that she meant that she did not sign the form, that statement is inconsistent with her testimony that she consented to the search of the Trailblazer and that she saw Special Agent Vesling writing on her notepad [*id.* at 17-18], and the Court finds the way that she phrased her denial incredible.   Thus, the Court finds that Chaunda Jackson signed the handwritten consent form confirming that she gave the FBI permission to search the Trailblazer.

9

did not alert to the presence of narcotics.  [*Id.* at 59.]  Police found and seized

four cell phones.  [*Id.* at 14-15, 46-47.]

### A.     Jackson has standing to challenge the voluntariness of Chaunda Jackson's consent to search the Trailblazer.

The government argues that Jackson lacks standing to challenge the

voluntariness of Chaunda Jackson's consent because Fourth Amendment rights

are personal and cannot be asserted vicariously.   [Doc. 994 at 9.]   The

government is correct that Fourth Amendment rights are personal, *see Rakas v.

Illinois*, 439 U.S. 128, 133 (1978), but Chaunda Jackson's consent to the search

has no bearing on Jackson's standing to challenge the search.  An individual

shows standing under the Fourth Amendment by showing a legitimate

expectation of privacy—that is, both a subjective expectation and an objectively

reasonable expectation—in the area searched.  *See United States v. Cooper*, 133

F.3d 1394, 1398 (11th Cir. 1998); *United States v. Rodriguez-Alejandro*, 664 F.

Supp. 2d 1320, 1341 (N.D. Ga. 2009).  Notably, the government does not dispute

that Jackson has standing to challenge the search of the Trailblazer based on a

legitimate expectation of privacy in the vehicle, and the Court finds, based on the

record before it, that Jackson has standing to challenge the search of the

Trailblazer.  The Trailblazer was registered in Chaunda Jackson's name, but it

was a family car that Jackson and Chaunda Jackson fully shared.  [*See* Doc. 895 at 6.]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  That right "is generally preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer upon a showing of probable cause."  *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006).  There are exceptions, including the exception for searches conducted pursuant to consent.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Where the government relies on the consent exception, whether it relies on the consent of the defendant or the consent of another individual, the government has the burden of showing that such consent was voluntary.  *See United States v. Matlock*, 415 U.S. 164, 171 (1974) ("[W]hen the prosecution seeks to justify a warrantless search *by proof of voluntary consent*, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party . . . ." (emphasis added)); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (holding that a prosecutor who relies on consent to justify a search must show that such consent was freely and voluntarily given);

11

*see also United States v. Antone-Herron*, 593 F. App'x 960, 963-64 (11th Cir. 2014) (considering a defendant's challenge to his co-occupant's consent to search a home); *United States v. Weeks*, 666 F. Supp. 2d 1354, 1373-74 (N.D. Ga. 2009) (same).  A defendant who believes that his Fourth Amendment rights have been aggrieved, notwithstanding the government's contention that another individual consented to a search, is free to challenge the voluntariness of that consent, just as he is free to challenge the person's authority to consent and the fact of the consent itself.

In sum, if the government wishes to rely on Chaunda Jackson's consent to justify the search of the Trailblazer, it must show that her consent was voluntary. It cannot jettison its burden in the name of standing.

**B.      Chaunda Jackson's consent to the search of the Trailblazer was voluntary.**

Jackson argues that Chaunda Jackson's consent to search the Trailblazer was not voluntary because she was seized or detained at the time that she gave consent, and therefore there was no valid "consent search" of the car.  [Doc. 1036 at 6-7.]  He points to a number of facts that show that Chaunda Jackson was detained, including that the officers were armed, that they came at the "crack of dawn while she and her children were sleeping," that their weapons were visible

to her, and that they gained entry into the home by refusing to allow her to check on her children unless they accompanied her.  [*Id.* at 7.]  Jackson further argues that law enforcement had no reasonable suspicion to seize Chaunda Jackson, and, thus, her detention was unlawful and any consent was not provided freely and voluntarily.  [*Id.*]

The premise of Jackson's argument—that Chaunda Jackson was detained or seized by law enforcement when she consented to the search—is incorrect.  On the record before the Court, the Court readily concludes that Chaunda Jackson was not detained by law enforcement when she gave consent to the car search.  The agents did not arrest her, threaten to arrest her, or make some other show of authority suggesting she was not free to tell them to leave the house.  Chaunda Jackson did not attempt to end the conversation with the agents or ask them to leave.  At the doorway, when she asked to take a break to check on her children, they told her that they would have to accompany her inside for their safety, and she invited them in, albeit reluctantly.[6]  After checking on her children, she closed

_____

[6] The Court has doubts about whether the agents actually had the authority to enter Chaunda Jackson's home without her consent, and that issue is explained below in the Court's analysis of the agents' entry into the home and the protective sweep.  But the question here is whether Chaunda Jackson's consent to the car search was voluntary, not whether her consent to the entry of the home was

the front door and led the agents to the kitchen table, rather than asking them to go back outside.  [Doc. 895 at 14.]  Under the circumstances, a reasonable person would have felt free to tell the agents to leave the house.  *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free to disregard the police and go about his business the encounter . . . will not trigger Fourth Amendment scrutiny . . . ." (quotation and citation omitted)).

In assessing whether a person's consent is voluntary, the Court considers factors such as the presence of coercive police procedures, the extent of the consenter's cooperation with the officers, the person's awareness of his or her right to refused consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001); *Weeks*, 666 F. Supp. 2d at 1374.  Weighing these factors, the Court finds that Chaunda Jackson's consent to the search of the Trailblazer was voluntary.  The most salient factor here is the absence of coercive police procedures when Special Agent Vesling asked Chaunda Jackson to consent to the car search.  Chaunda Jackson felt that Special Agent Vesling was being

---

voluntary.  The Court readily concludes that that Chaunda Jackson was not seized when she was sitting with the agents at her kitchen table and consented to the search.

straightforward and "real" with her.  Otherwise, Special Agent Vesling had a "relaxed" demeanor while speaking with Chaunda Jackson at the kitchen table. Chaunda Jackson thought that Officer Castro was "stern," and she testified that she was anxious and afraid during her encounter with the agents, but her anxiety and fear were not caused by any police conduct.  Furthermore, Chaunda Jackson's anxiety and fear about further police investigation if she did not consent shows that she was aware of her right to refuse to consent.

Although she testified that her desire to cooperate with law enforcement was based on her fear that police might search the house or arrest her, Chaunda Jackson acknowledged that she gave her consent out of a desire to cooperate. Moreover, Chaunda Jackson verbally consented to the search, signed a document memorializing her consent, and allowed the police to drive the car to her house, which also suggests a willingness to cooperate.

The Court further finds, upon observing Chaunda Jackson as she testified, that she is clearly an intelligent person.  She has an associate's degree.  [Doc. 895 at 3-4.]  Finally, Chaunda Jackson fully shared in the use of the Trailblazer with Jackson, and there is no suggestion that she thought that there was any contraband or evidence of a crime in the Trailblazer.  Considering all of these factors, the Court concludes that Chaunda Jackson's consent to the search was voluntary.

15

### C.   The entry into the home and the protective sweep did not taint Chaunda Jackson's consent to the search of the Trailblazer.

Jackson next argues that Chaunda Jackson was not under arrest or the target of any investigation, and, thus, law enforcement did not have legitimate safety concerns in conducting a protective sweep of her home.  [Doc. 1036 at 8.] Jackson contends that Chaunda Jackson's consent to search the family car was the product of, and tainted by, the unlawful search of her home.  [*Id.* at 8-11.]

The Supreme Court has defined a "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others."  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  *Id.*

"Most courts . . . have expanded *Buie* beyond in-home arrests pursuant to a warrant to all situations wherein officers are lawfully present in the home." *United States v. Legette*, 260 F. App'x 247, 249-50 (11th Cir. 2008) (citing *United States v. Miller*, 430 F.3d 93, 99 (2d Cir. 2005)).  A *Buie* sweep is justified when officers enter a home with consent and observe "articulable facts and inferences from them that le[a]d to the reasonable belief that someone present[s] a danger."  *United States v. Cordova*, 758 F. Supp. 2d 1367, 1376 (N.D. Ga. 2010).

16

In cases where *Buie* sweeps have been permissible, the "articulable facts and inferences of danger" were perceived after the officers' entry into the home, and the officers "strictly observed" the sweep protocol prescribed by *Buie*. *Id.*

Here, the very limited protective sweep likely met the requirements of *Buie*—assuming that the agents were lawfully in the house. The sweep consisted of a very limited visual inspection of the room or rooms that Chaunda Jackson looked in. The agents reasonably wanted to confirm that the only other people in the house were Chaunda Jackson's children, particularly because they were at the home of an individual they believed to be a high-ranking gang member. The agents also had cause for concern about Chaunda Jackson entering into closed bedrooms. She could have informed a confederate of Jackson's that the agents were at the house or even retrieved a weapon.

It is less clear, however, that Special Agent Vesling and Officer Castro could use a protective sweep to justify their entry into the home in the first place. *See Legette*, 260 F. App'x at 249-50. Police are not, as a routine matter, allowed to enter a home to conduct a protective sweep when they knock on a door to interview an occupant, even though there is often a possibility that other people are within the home. The particular circumstances here, where a person wants to step away from the door briefly to go inside the home, could create a heightened

17

concern for officer safety.  But the government has not cited any case suggesting that the police have the authority to conduct a protective sweep, or even detain a home's occupant, because the occupant asks to leave the doorway to check on her children.  [*See* Doc. 994 at 11.]

This issue also bears on the validity of Chaunda Jackson's consent for the agents to enter the home.  The agents told Chaunda Jackson that she could not leave the doorway to check on her children unless they came into the house too. The government has not cited any case suggesting that the agents had the authority to make that demand of Chaunda Jackson, and the agents may have overstated their authority.  *See United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017) ("Deceit can also be relevant to voluntariness."), *petition for reh'g denied*, No. 15-15023, Sept. 13, 2017.  This does not mean that Chaunda Jackson was compelled to let the agents in.  She could have briefly delayed checking on her children, or she could have discontinued the conversation and told the agents to leave.  She also had reason to want to continue the discussion with the agents, as they were giving her information about her husband's arrest and the charges against him.

In light of the totality of the circumstances, the Court concludes that, even though Chaunda Jackson did not feel as though she could check on her children

when she wanted to unless she let the agents inside, she did voluntarily consent to the agents' entry into the home.  But even assuming *arguendo* that the initial entry into the home was not lawful, the question for the court would be whether the subsequent consent to a search of the car was a product of the illegal entry. *See United States v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000).  When evaluating such claims, courts consider as a threshold matter whether the person voluntarily consented to the search.  *Id.*  The second part of the inquiry "focuses on causation," namely, whether the consent was tainted by the initial illegal search. *Id.* at 676-77 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).  In making that determination, courts consider factors such as the temporal proximity between the search or seizure and the consent, the presence of intervening circumstances, and the purpose and flagrancy of official misconduct.  *Id.* at 677; *see also United States v. Delancy*, 502 F.3d 1297 (11th Cir. 2007) (concluding that a warrantless entry into a home and protective sweep, which the Court assumed were unlawful, did not taint an occupant's subsequent consent to the search of the home).

Here, even if the initial entry and the protective sweep were unlawful, the Court does not find that they tainted Chaunda Jackson's subsequent consent to the car search.  The protective sweep was extremely limited in scope.  Special Agent

19

Vesling followed Chaunda Jackson as she opened her children's bedroom door or doors while Officer Castro waited in the living room.  There is no dispute that this limited sweep was conducted for officer safety.  The agents were justifiably concerned about their safety in the home of an alleged high-ranking gang member.  Thus, any official misconduct was very limited and was done for the purpose of ensuring officer safety.  As to the remaining factors, the search and the consent to the search of the car were close in time, and there were no intervening circumstances, such as the advisement of her right not to consent to the search. The Court also notes that Chaunda Jackson wanted the car driven back to her house so that she did not have to wake the children to retrieve it, and she was cooperative with the agents at the doorway as well as inside the house.  After the brief protective sweep, she did not return to the doorway, but rather, led the agents to the kitchen to sit at the kitchen table.  Balancing the factors, and in view of the totality of the circumstances, the Court concludes that the entry into the home and the protective sweep, even if unlawful, did not taint Chaunda Jackson's subsequent consent to the car search.

> **D.**      **The rule in *Georgia v. Randolph* does not invalidate Chaunda Jackson's consent.**

When two individuals both hold an expectation of privacy in the same area or item, both individuals have the right to provide or deny consent to search. *Matlock*, 415 U.S. at 171.  If both parties are present and one party consents while the other party objects, then a warrantless search is not permissible as to the objecting party.  *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006) ("[I]f a potential defendant with self-interest in objecting is in fact at the door [of a home] and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.").  If one individual is present, and the other is not, then the present individual's consent to search is sufficient.  *Matlock*, 415 U.S. at 170.

In *Randolph*, the Supreme Court noted a narrow exception to the general rule that an objector must be present and must actually object to the search for his objection to prevail over a co-tenant's consent:  law enforcement officers may not remove an individual from the entrance to a home for the purpose of avoiding his possible objection.  *Randolph*; 547 U.S. at 121; *see also United States v. Cooke*, 674 F.3d 491, 499 (5th Cir. 2012) (noting that the Supreme Court seemed to have structured *Randolph* as an exception to the general rule of *Matlock*), *cited with approval in United States v. Watkins*, 760 F.3d 1271, 1281 (11th Cir. 2014).  The *Randolph* Court expressly declined "to hold that reasonableness required the

police to take affirmative steps to find a potentially objecting co-tenant before acting on [a co-tenant's] permission." *Randolph*, 547 U.S. at 122.  The Eleventh Circuit and other circuits also have interpreted *Randolph* "narrowly."  *Watkins*, 760 F.3d at 1281 (collecting cases).

Jackson argues that *Randolph* controls the circumstances of this case.  In particular, law enforcement pulled him over while driving, took him into custody, and then went to his home to get consent from Chaunda Jackson to search the car. [Doc. 1036 at 12.]  All this was done, Jackson contends, in an effort to avoid his possible objection to law enforcement searching the vehicle.  [*Id.*]

The narrow exception in *Randolph* plainly does not apply to this case.  As an initial matter, it is not settled that the exception in *Randolph* applies to vehicle searches, and the Eleventh Circuit has not yet had the opportunity to decide the question.  *See United States v. Thomas*, 818 F.3d 1230, 1241 (11th Cir.) (noting a split in authority but concluding that it did not need to settle the issue to decide *Thomas*), *cert. denied* 137 S. Ct. 171 (2016).  But even if *Randolph* applies here, police removed Jackson from the scene of the traffic stop because he was under arrest pursuant to an indictment, and they wanted to interview him before placing him in the custody of the U.S. Marshals.  They did not ask him for consent to search the car, and there was no need for police to take affirmative steps to give

Jackson an opportunity to object to a search.  Moreover, Chaunda Jackson was at home and was not involved in the traffic stop.  The Court therefore finds that the government did not remove Jackson from the scene to prevent him from objecting to Chaunda Jackson's consent to the car search.  Thus, Chaunda Jackson's consent was not obtained in violation of *Randolph*.

### E.  Jackson's post-arrest statements are not subject to suppression under *Corley v. United States*.

In his motion to suppress statements, Jackson argues that statements he made during his post-arrest interview with police should be suppressed under *Corley v. United States*, 556 U.S. 303 (2009).  [Doc. 750 at 2-3; Doc. 1036 at 14.] He asserts that police subjected him to a custodial interview rather than bringing him before a magistrate judge in a timely manner.[7]  [Doc. 750 at 2-3.]

Federal Rule of Criminal Procedure 5 provides that a person making an arrest must "take the defendant without unnecessary delay before a magistrate judge."  Fed. R. Civ. P. 5(a)(1)(A).  Further, 18 U.S.C. § 3501(c) provides:

> In any criminal prosecution by the United States . . . , a confession
> made or given by a person who is a defendant therein, while such

---

[7] In his motion to suppress statements, Jackson generally argues that his statements during the interview were not voluntary and were made without a knowing wavier of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). That issue has been deferred to the District Judge.

person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided*, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge . . . .

In *Corley*, the Supreme Court reaffirmed a longstanding exclusionary rule, as modified by § 3501,[8] that confessions made after arrest may be inadmissible if they are made after an unreasonable delay in presenting the defendant to a judicial officer.   556 U.S. at 322.   The threshold question in evaluating *Corley* suppression claim is whether the defendant made inculpatory statements within six hours of his arrest, unless a longer delay was reasonable considering the means of transportation and distance of travel to the nearest available magistrate judge.  *Id.*  If the statement was made during that six-hour post-arrest window, it is admissible if otherwise voluntary, subject to the Federal Rules of Evidence.  *Id.*

---

[8] *Corley* explains the origin of the exclusionary rule based on the "prompt presentment" requirement and the congressional response to that rule, which the Court need not recite here.  556 U.S. at 306-10.

24

If the statement was made outside the six hour window, and before the defendant was presented to a magistrate judge, the court must decide whether the delay in presenting was unreasonable or unnecessary.  *Id.*

Here, Jackson's *Corley* claim fails at the threshold question because the statements he seeks to suppress were made within six hours of his arrest.  Jackson was arrested at 5:24 a.m., was in the custody of the U.S. Marshals by 9:30 a.m., and was interviewed by pretrial services at 10:45 a.m.  The Court finds that his interview with police concluded before 9:30 a.m., and any statements that he made during that interview are not subject to suppression under *Corley*.

### F.    The motions to suppress should be denied.

Based on the foregoing, the Court **RECOMMENDS** that the motions to suppress be **DENIED**.[9]

## III.   MOTION FOR A BILL OF PARTICULARS [DOC. 735]

In his motion for a bill of particulars [Doc. 735], Jackson requests that the government provide the following specific information:

---

[9] In light of the Court's conclusion that agents lawfully obtained Chaunda Jackson's consent to search the Trailblazer, the Court does not reach Jackson's arguments regarding the applicability of the inevitable discovery exception to the exclusionary rule and the automobile exception to the warrant requirement.  [*See* Doc. 1036 at 13.]

1.      When, with whom, and how did he join and remain in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise engaged in acts involving murder.

2.      When, with whom, and how did he join and remain in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise manufactured, distributed, and possessed with . . . intent to distribute controlled substances including more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine, more than one kilogram of a mixture and substance containing a detectable amount of heroin, and more than five kilos of a mixture and substance containing a detectable amount of cocaine.

3.      When, with whom, and how did he knowingly, willfully and [un]lawfully combine, conspire, confederate and agree to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in a pattern of racketeering activity.

4.      When, with whom, and how did he knowingly willfully and [un]lawfully combine, conspire, confederate and agree via the 131 Overt Acts listed in the indictment . . . to further the conspiracy and to effect the purposes [of] the conspiracy.

5.      How did the alleged cocaine trafficking [described in paragraphs 54 and 58] of the indictment further the goals and aims of this conspiracy.

6.      How did the alleged meeting with the alleged Gangster Disciple founder [described in paragraph 119] of the indictment further the goals and aims of this conspiracy.

[Doc. 735 at 2-3.]

The government responds that Jackson's request for a bill of particulars is

"nothing more than an impermissible attempt to compel the government to

26

provide a detailed exposition of the evidence upon which it intends to rely at trial." [Doc. 846 at 11-13.] It argues that it is not required to prove any overt acts in furtherance of the RICO conspiracy. [*Id.*] Without abandoning those arguments, the government also provides additional information in response to some of the items that Jackson requested. As to items 1, 2, and 3, the government also provided, under seal, a list of co-conspirators. [*Id.* at 11-12.] The government directs Jackson to look at specific discovery items for further information about items 1 and 2. The government asserts that its theory about Jackson's involvement in cocaine trafficking is that drug trafficking was used to contribute more money to the criminal enterprise, and its theory about Jackson's meeting with the leader of the Gangster Disciples was that the meeting allowed Jackson to disseminate the leader's theory and philosophy to the gang. [*Id.* at 13.]

Federal Rule of Criminal Procedure 7(f) explains that:

> The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

Fed. R. Crim. P. 7(f). The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to

27

prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (citation omitted), *petition for cert. filed* June 20, 2017.  A bill of particulars may not be used for the purpose of obtaining detailed disclosure of the government's case or evidence in advance of trial.  *See United States v. Perez*, 489 F.2d 51, 70-71 (5th Cir. 1973).  "Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection."  *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986), *modified on other grounds by*, 801 F.2d 378 (11th Cir. 1986).

Regarding items 1 through 3, in which Jackson requests the dates, names of alleged-co-conspirators, and means by which he joined the conspiracies to commit murder, engage in drug offenses, and engage in a pattern of racketeering, the Court finds that the indictment provides sufficient detail of the charges against him.  *See United States v. Reid*, No. 3:09-CR-312-J-34TEM, 2010 WL 2653229, at *2 (M.D. Fla. July 2, 2010) (denying request for bill of particulars to specify date when alleged conspiracy was formed and the date on which each defendant joined conspiracy where indictment provided the purpose of the alleged conspiracy, the participation of the defendant in the conspiracy, and the overt acts

28

that defendant allegedly committed, as well as approximate dates of activity). Moreover, the government has provided a list of coconspirators to Jackson.

Furthermore, item 4 seeks detail regarding additional possible overt acts in which he was allegedly involved, but overt acts are not elements of a RICO conspiracy. *See Salinas v. United States*, 522 U.S. 52, 63 (1997); *see United States v. Henley*, No. 1:16-cr-151-LMM-JFK, 2017 WL 2952821, at *16 (N.D. Ga. May 19, 2017) (denying motion for bill of particulars seeking details concerning overt acts taken in furtherance of extortion and drug conspiracies), *report and recommendation adopted*, 2017 WL 2918954 (N.D. Ga. July 7, 2017). As such, Jackson "is not entitled to an accounting of the 'overt acts' he committed in furtherance of [the charged conspiracy]." *Henley*, 2017 WL 2952821, at *16; *see also United States v. Coleman*, No. 1:07-CR-233-ODE-RGV, 2010 WL 11507843, at *7 (N.D. Ga. Feb. 24, 2010) ("A bill of particulars cannot be used to ferret out additional overt acts not listed in the indictment, as long as the indictment alleges the required number of overt acts under the statute being charged."), *report and recommendation adopted*, 2010 WL 11515338 (N.D. Ga. May 18, 2010).

Finally, in items 5 and 6, Jackson essentially seeks detail on the government's theory of the case. The government has provided such detail in its

response, and in any event, Jackson seeks evidentiary detail to which he is not entitled in a bill of particulars.  *See United States v. Chaidez-Ontiveros*, No. 1:11-cr-264-AT-JFK, 2011 WL 7574634, at *2-3 (N.D. Ga. Oct. 25, 2011) (denying motion for a bill of particulars where the defendant sought the government's theory of the case and evidentiary detail, where the government "provided . . . a wealth of information in discovery" and the indictment fully apprised the defendant of the charges).  Accordingly, Jackson's motion for a bill of particulars is **DENIED**.  [Doc. 735.]

## IV.   MOTION FOR DISCLOSURE OF CONFIDENTIAL INFORMANTS [DOC. 1037]

On August 6, 2017, Jackson filed a motion for disclosure of and access to confidential informants.  [Doc. 1037.]  Jackson asserts that the government informed him that there is at least one confidential informant who had "interaction" with him, and that witness is expected to testify at trial.  [*Id.* at 1.] He argues that he is entitled to the name and contact information of that witness and any other confidential informant because his need for access to those individuals outweighs the government's interest in maintaining secrecy around that issue.  [*Id.* at 4.]  Counsel for Jackson expects that the confidential informant's alleged interaction with Jackson "would be of an active participatory

30

nature," presumably regarding Jackson's alleged leadership role in the Gangster Disciplines and in dealing narcotics. [*Id.*]

It is well-established that the government has a limited privilege to withhold the identity of law enforcement informants. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). The purpose of this privilege "is the furtherance and protection of the public interest in effective law enforcement." *Id*. But where the disclosure of an informant's identity or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the trial court may require disclosure. *Id*. at 60-61. In balancing these interests, the Court must take into account "the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). Courts in this Circuit consider the following three factors in evaluating whether the government should be required to reveal the identity of informants: "(1) the extent of the CI's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the CI; and (3) the government's interest in nondisclosure." *United States v. Razz*, 240 F. App'x 844, 847 (11th Cir. 2007) (citing *Gutierrez*, 931 F.2d at 1490).

31

The concerns in *Roviaro* are generally inapplicable, however, where the government intends to call the informant as a witness at trial.  *See Banks v. Dretke*, 540 U.S. 668, 697 (2004) ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness."); *United States v. Rook*, No. 1:15-CR-380-SCJ, 2016 WL 2344877, at *3 (N.D. Ga. May 3, 2016); *United States v. Pineda*, No. 1:11-CR-00006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June 4, 2012) ("Neither the Federal Rules of Criminal Procedure, *Brady*, the *Jencks* Act, or *Giglio* require the disclosure of information related to a testifying witness any earlier than the Government has offered to make disclosure in this case."), *adopted at*, 2012 WL 2907447 (N.D. Ga. July 16, 2012).  Here, the government has indicated that it intends to call the confidential informant relating to the charges against Jackson as a witness during the trial and will disclose the identity of the informant prior to the trial and provide any related *Jencks* Act, *Brady*, and *Giglio* materials related to the confidential informant. [Doc. 1068 at 9.]  In light of this representation, the Court will not require the government to disclose the identity of such confidential informant at this time.

The Court additionally concludes that Jackson has not met the second *Roviaro* factor—*i.e.*, a direct relationship between his defense and the probable

32

testimony of the informant.  The burden is on the defendant to show that the informant's testimony would significantly aid in establishing an asserted defense. *United States v. Johnson*, --- F. App'x ---, 2017 WL 2954570, at *1 (11th Cir. July 11, 2017) (citing *Gutierrez*, 931 F.2d at 1491).  "Mere conjecture about the possible relevance of the testimony is insufficient to compel disclosure." *Id*.

Jackson asserts that he would like to have access to the confidential informant to prepare for trial because the confidential informant will have first-hand knowledge of his involvement in the case.  [Doc. 1037 at 4.]  This is insufficient.  Jackson has not indicated what information he believes that he would obtain from the confidential informant or why it would materially support his defense.  In fact, Jackson does not specify what defense that might be.

For the foregoing reasons, *Roviaro* does not require disclosure of the confidential informant's or informants' identity or identities at this time. Jackson's motion for disclosure of and access to confidential informants is therefore **DENIED**.  [Doc. 1037.]

## V.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Jackson's motions to suppress be **DENIED**.[10] [Docs. 736, 750.] The Court **ORDERS** that Jackson's motion for a bill of particulars and motion for disclosure of confidential informants be **DENIED**. [Docs. 735, 1037.]

There are no matters pending before me for Defendant Jackson (8), and I have not been advised of any impediments to the scheduling of a trial as to this defendant. Accordingly, this matter as to this defendant is **CERTIFIED READY FOR TRIAL**.[11]

---

[10] The Court reiterates that Jackson's argument that his statements during the post-arrest interview were not voluntary and were made without a knowing wavier of his rights under *Miranda* is deferred to the District Judge.

[11] Since matters pertaining to Jackson's codefendants still are pending, the District Court is not required to place Jackson's case on the trial calendar at this time. 18 U.S.C. § 3161(h)(6).

**IT IS SO ORDERED, RECOMMENDED, AND CERTIFIED** this 4th day of October, 2017.

_____
JOHN K. LARKINS III
UNITED STATES MAGISTRATE JUDGE